# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| JOHN PITTS and MARIA JIMENEZ Individually and as representatives of a class of participants and beneficiaries on and on behalf of the CHARTER COMMUNICATIONS, INC., 401(K) SAVINGS PLAN, <br><br> Plaintiffs, <br><br> v. <br><br> CHARTER COMMUNICATIONS, INC., CAROLYN WOOD, PAUL WEBER, BETH BIGGS, and John Does 1-30 <br><br> Defendants. | Case No. 4:25-cv-00178 |

## CLASS ACTION COMPLAINT

### I.    NATURE OF ACTION

1.      Plaintiffs John Pitts and Maria Jimenez, individually, as representatives of the Class described below, and on behalf of the Charter Communications, Inc. 401(k) Savings Plan (the "Plan"), bring this action under 29 U.S.C. § 1132 against Defendants Charter Communications, Inc. ("Charter"), Carolyn Wood, Paul Weber, Beth Biggs, and John Does 1-30 in their capacities delegees and/or appointees of Charter acting as Plan fiduciaries in the misconduct alleged herein (collectively, "Defendants"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* and the Plan.

1

2.      Prior to Amendments effective as of January 1, 2025, Section 6.9 of the Plan[1] required Defendants to use any Forfeited Plan Assets first to pay all Plan administrative expenses *before* using any forfeited plan assets to defray Charter's obligation under the Plan to make Employer Contributions. Moreover, Section 11.3 of the Plan reiterated that "all expenses of administration of the Plan shall be paid out of forfeitures, if any, and if none, borne by Charter." Notwithstanding this mandatory, non-discretionary directive, Defendants failed to use Forfeited Plan Assets to pay tens of millions of dollars of Plan administrative expenses and instead used those funds (over tens of millions of dollars) to benefit themselves by subsidizing Charter's obligation to make Employer Contributions. As a result, Charter was enriched and the accounts of every Plan participant were reduced by the *pro rata* share of Plan administrative expenses charged to their account, thereby reducing the amount of their vested, pension benefits account.

3.      Just days after Charter received Plaintiff Jimenez' pre-suit request for documents pursuant to 29 U.S.C. §§ 1021, 1024 & 1132, Defendants, on information and belief, recognized that they had been caught violating the unambiguous, mandatory provisions of Sections 6.9 and 11.3 of the Plan by failing to use forfeited plan assets first to pay all Plan administrative expenses *before* using any forfeited plan assets to defray Charter's obligation under the Plan to make Employer Contributions, and in the expectation they would be sued, hastily enacted an Amendment (the "2025 Amendment")with a first sentence that: "The Plan is hereby amended effective January 1, 2025." The 2025 Amendment purported change Sections 6.9 and 11.3 of the Plan to remove the unambiguous, mandatory provisions of Sections 6.9 and 11.3 to remove the prior mandatory requirement to use forfeited plan assets first to pay all Plan administrative

---

[1] All references to provisions of the Plan are to the Charter Communications, Inc 401(K) Savings Plan, Amended and Restated as of January 1, 2017, except with respect to specific references to the2025 Amendments enacted in 2025 and purportedly effective as of January 1, 2025.

expenses *before* using any forfeited plan assets to defray Charter's obligation under the Plan to make Employer Contributions.

4.      Plaintiffs bring this action to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan and injury to Plaintiffs and the Class (defined herein) resulting from the Defendants' fiduciary breaches and prohibited transactions described below, and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. U.S.C. § 1102(a)(3).

## II.     JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA, 29 U.S.C. § 1132(a)(2), (a)(3) and (c)(1) for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

6.      Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e), 28 U.S.C. § 1391 and Section 13.2 of the Plan, which provides that "[n]o civil action in connection with the Plan (including but not limited to a claim for benefits payable under the Plan) shall be brought in any court other than the United States district court in St. Louis, Missouri."

## III.    THE PARTIES

7.      At all relevant times, Plaintiff John Pitts, a resident of Texas, by virtue of his prior employment with Charter and his continuing participation and investments in the Plan, has been damaged by Defendants' failure to comply with the mandatory provisions of Sections 6.9 and 11.3 and also is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations alleged herein. Thus, Plaintiff Pitts is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7) and has suffered an injury redressable by his claims herein. In addition to his continuing participation in the Plan, during his employment with Charter,

which continued into 2025, Plaintiff Pitts was also a participant in the Charter Communications, Inc. Retirement Accumulation Plan (the "Accumulation Plan").

8.      At all relevant times, Plaintiff Jimenez, a resident of South Carolina, by virtue of her prior employment with Charter and her continuing participation and investments in the Plan, has been damaged by Defendants' failure to comply with the mandatory provisions of Sections 6.9 and 11.3 and also is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations alleged herein. Thus, Plaintiff Jimenez is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7) and has suffered an injury redressable by her claims herein.

9.      The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34) and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1003(a).

10.      Defendant Charter Communications, Inc. is a company with a principal place of business located at 400 Atlantic Street, 10th Floor, Stamford, Connecticut 06901. Charter is the Plan Administrator. Charter is the sponsor of the Plan per ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B); a party in interest under ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A) and the Plan.

11.      Defendant Carolyn Wood was a Charter employee delegated and/or appointed by Charter to act as Plan Administrator, was a party-in-interest under ERISA § 3 (14)(A), 29 U.S.C § 1002 (14)(A), and a fiduciary of the Plan under ERISA § 3 (21)(A), 29 U.S.C. § 1002 (21)(A) and the Plan in the Class Period.

12.      Defendant Paul Weber is a Charter employee delegated and/or appointed by Charter to act as Plan Administrator and Senior Director of Retirement Benefits, was a party-in-interest

under ERISA § 3 (14)(A), 29 U.S.C. § 1002 (14)(A), and a fiduciary of the Plan under ERISA § 3 (21)(A), 29 U.S.C. § 1002 (21)(A) and the Plan during the Class Period.

13.     Defendant Beth Biggs joined Charter as its Benefits Director in 2010 and was delegated and/or appointed by Charter since no later than 2013 to serve as Charter's Senior Benefits Manager; no later than 2014 to serve as its Vice President of Benefits; and no later than June 2018 to serve in her current position as Group Vice President, Benefits & Employee Services Center, with responsibility for Charter's 95,000 employees' health, welfare, benefits administration, retirement programs, employee services center and HR continuous improvement. On information and belief, she was a party-in-interest under ERISA § 3 (14)(A), 29 U.S.C. § 1002 (14)(A), and a fiduciary of the Plan under ERISA § 3 (21)(A), 29 U.S.C. § 1002 (21)(A) and the Plan during the Class Period.

14.     Defendants John Does 1-30, as appointees and/or delegees of Charter, were parties-in-interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) and the Plan, in the exercise of discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets as alleged herein. Plaintiffs will seek leave to amend the Complaint to name each of these John Does once they ascertain their identities in discovery.

## IV.    <u>ERISA FIDUCIARY STANDARDS</u>

15.     Section 11.1 of the Plan provides that Charter or its delegates shall be the administrator of the Plan within the meaning of Section 3 (16)(A) of ERISA and shall have all powers necessary to administer the Plan except any such powers are vested in any other Fiduciary by the Plan, by the Board, by the Investment Committee, or by the Administrator. Section 11.2

authorizes the Administrator to delegate any of its powers or duties to others as the Administrator shall determine.

16.     Section 12.2 of the Plan provides: Officials of Charter may allocate their fiduciary responsibilities under the Plan among themselves, and Charter officials may designate other persons to carry out its (or his or her) fiduciary responsibilities under the Plan.

17.     Section 12.4 of the Plan provides: All Fiduciaries under the Plan (including the Trustee, the Administrator, and the members of the Investment Committee) shall discharge their duties with respect to the Plan and the Trust solely in the interest of the Participants and their Beneficiaries and with care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

18.     Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Section 1.29 of the Plan provides: "*Fiduciary* shall mean any person to the extent that the person (a) exercises any discretionary authority or discretionary control respecting management of the Plan or exercise any authority or control respecting management or disposition of its assets, (b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan or has any authority or responsibility to do so, or (c) has any discretionary responsibility in the administrator of the Plan, and includes persons designated by fiduciaries named in the Plan to carry out fiduciary responsibilities under the Plan."

19.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.  Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

20.    ERISA imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

21.    ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants acting as Plan fiduciaries. ERISA's fiduciary duties are among the "highest known to the law." *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 598 (8th Cir. 2009).  A plan fiduciary must be prudent, exercising the care, skill, prudence, and diligence that a person with like capacity and

7

familiarity would do under the circumstances.  29 U.S.C. § 1104(a)(1)(B).  A plan fiduciary must

also defray reasonable expenses of administering the plan as expenses such as administrative fees

can significantly reduce the value of an account in a plan.  *Eckelkamp v. Beste*, 201 F. Supp. 2d

1012, 1021 (E.D. Mo. 2002); *Tibble v. Edison Int'l.*, 575 U.S. 523, 525 (2015)).  Fiduciary

decisions must be made with "an eye single to the interests of the participants."  *Rozo v. Principal*

*Life Ins. Co.*, 48 F.4th 589, 595 (8th Cir. 2022).

22.     29 U.S.C. § 1104(a)(1) provides in relevant part:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-

(A) for the exclusive purpose of

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

* * *

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(4) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(5) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(6) if he has knowledge of a breach by such other fiduciary, unless he makes
reasonable efforts under the circumstances to remedy the breach.

23.    ERISA's anti-inurement provision prohibits employers from using plan assets for

their own benefit.  29 U.S.C. § 1103(c)(1) provides in relevant part:

[T]he assets of a plan shall never inure to the benefit of any employer and shall be
held for the exclusive purposes of providing benefits to participants in the plan and
their beneficiaries and defraying reasonable expenses of administering the plan.

24.    29 U.S.C. § 1106 prohibits certain transactions.  29 U.S.C. § 1106(a) provides in

relevant part:

A fiduciary with respect to a plan shall not cause the plan to engage in a transaction,
if he knows or should know that such transaction constitutes a direct or indirect-

(A) sale or exchange, or leasing, of any property between the plan and the party in
interest;

(B) lending money or other extension of credit between the plan and a party in
interest;
(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any asset of the
plan; or
(E) acquisition on behalf of the plan, of any employer security or employer real
property in violation of section 407(a)

25.    29 U.S.C. § 1106(b) provides in relevant part:

A fiduciary with respect to a plan shall not-

(1) deal with the assets of the plan in his own interest of for his own account,

(2) in his individual or in any other capacity act in any transaction involving the
plan on behalf of a party (or represent a party) whose interests are adverse to
the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing
with such plan in connection with a transaction involving the assets of the
plan.

## V.    **FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

26.    The Plan is a defined contribution 401(k) plan sponsored and administered by Charter and to provide benefits to eligible employees. The Plan is subject to ERISA. Charter is the Sponsor of the Plan under ERISA.

27.    In accordance with 29 U.S.C. § 1103(a), the assets of the Plan and the Accumulation Plan are held in a trust fund under a Trust Agreement (the "Master Trust") between Charter (or a subsidiary if authorized by Charter) and the Trustee, as may be amended from time to time, which Trust Agreement shall form part of the Plan. The Trustee is the trustee or trustees appointed by Charter and serving under the Trust Agreement at the particular time. At all relevant times, the Plan averaged about 88% of the total assets held in the Master Trust, and the Accumulation Plan comprised about 12%.

28.    As an individual account, defined contribution retirement plan, the Plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

29.    Under the terms of the Plan, Defendants were required to, among other things, act "for the exclusive purpose of providing benefits to Participants and their beneficiaries and defraying reasonable expenses of administering the Plan." The Plan document refers to the "expenses of administering the Plan" as "Plan expenses" (hereafter "Plan Expenses").

30.    Throughout the Class Period, the Plan has been funded by a combination of wage withholdings by Plan Participants and matching contributions by Charter, among other sources,

each of which is deposited into the Plan's trust fund and allocated to individual Participant accounts.

31.     Throughout the Class Period, the terms of the Plan required Charter to make matching contributions to the Plan based on each Participant's contributions. Section 4.1 of the Plan provides: "Except as otherwise provided in the Addendum, the Employer shall contribute on behalf of each Participant an amount equal to no more than 100% of the Participant's Election Deferrals for the Payroll Period attributable to the first 6% of the Participant's Compensation paid for the Payroll Period." Section 4.1 requires: "The aggregate amount of Employer Contributions in each Payroll Period shall be paid in cash by the Employer to the Trustee as soon as possible."

32.     Charter must pay in cash all matching contributions that have accrued throughout a calendar year to the Plan trustee within a reasonable period of time after the end of the prior calendar year. Upon their deposit into the Plan's trust fund, all Participant contributions and Charter contributions become assets of the Plan.

33.     Under the terms of the Plan, Participants are immediately vested in their own contributions, as well as any actual earnings thereon and vested in matching contributions by Charter and any actual earnings on such amounts based on various schedules dependent on their employer group typically ranging from four to six years before being fully vested.

34.     To the extent a Participant is not 100% vested upon termination of employment, the Participant forfeits the value of the Charter contributions ("Forfeited Plan Assets") in his or her account on the earlier of the date the Participant takes a distribution of his or her vested interest in the Plan or the date the Participant incurs a five-consecutive-year break in vesting service (within the meaning of the plan document).

35.     The Plan specifically prescribes the use of Forfeited Plan Assets. Section 6.9 of the

Plan governing forfeitures provides:

> Assets in Accounts which are forfeited shall be used to pay Plan administrative expenses.  To the extent that forfeitures exceed the Plan administrative expenses, forfeitures shall be used to reduce the Employer Contributions.

Section 11.3 of the plan governing expenses of administration provides:

> All expenses of administration of the Plan, including legal fees, agents' fees, costs of supplies, auditing fees, and other costs of operation, shall be paid out of forfeitures, if any, and if none, borne by Charter, which shall upon request reimburse the Trustee from time to time therefor.

36.     Charter, the drafter of the Plan, plainly required Forfeited Plan Assets to fund

expenses of Plan administration to benefit the Participants and Beneficiaries, not to fund Charter's

funding obligation.[2]

---

[2] In contrast, some plan sponsors take a different approach and direct plan trustees/administrators that forfeited funds must first go to defray the sponsor's obligations. For example, during the same approximate time as the class period alleged herein, one large plan sponsor had the following provision:

> Forfeitures will be used in the following order: (1) to be restored to a Participants' account following reemployment in accordance with the preceding paragraph; (2) to reduce employer contributions, including, but not limited to, future amounts contributed by the Employer or Employer Contributions and Matching Contributions; and (3) pay reasonable expenses Plan.

Other Plan sponsors take a different approach and provide plan trustees/administrators with discretion how to use forfeited funds. For example, during the same approximate time as the class period alleged herein, one large plan sponsor had the following provision:

> Any amounts forfeited pursuant to this Section, any amounts attributable to forfeitures transferred pursuant to the merger of another tax qualified plan with this Plan, and any other amounts to be treated as forfeitures under the Plan, shall be applied, at the Company's election, to: (i) pay expenses of administering the Plan; (ii) with respect to forfeitures of Matching Contributions or Safe Harbor Matching Contributions, reduce the Participating Employers obligation to make Safe Harbor Matching Contributions; and (iii) with respect to forfeitures of Profit Sharing Contributions, allocated as Profit Sharing Contributions…

37. Despite the Plan's clear requirement that the Forfeited Plan Assets were to be used first to pay Plan administrative expenses, Defendants used such assets to reduce Charter's employer contributions. Throughout the Class Period Defendants caused Plan Participants to pay significant portions of the Plan Expenses contrary to the express provisions of the plan document through deductions from the accounts of Plan Participants.

38. The decision to use and the use of Forfeited Plan Assets to benefit Charter at the expense of the Participants and Beneficiaries also violated the fiduciary duties of loyalty and prudence under ERISA and the Plan.

39. Because the assets of the Plan and the Accumulation Plan are held in the Master Trust, the Plan does not file a separate Schedule C since all of the Plan's expenses are pushed to the Master Trust. The Master Trust then appears to allocate expenses to the two underlying plans roughly in proportion to the assets in the underlying plans. The following chart breaks down the expenses disclosed through Schedule C of the Master Trust and also disclosed in the financial statements of the Form 5500s for each of the underlying plans, including the Plan.

| Master Trust - Total Amount of Direct Compensation - Schedule C | | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 | Totals |
| Total Direct Compensation | $7,998,867 | $8,183,562 | $8,610,551 | $9,858,080 | $9,083,574 | $43,734,634 |
| Statement of Changes in Net Assets Available For Benefits: Administrative Expenses | | | | | | |
| | 2019 | 2020 | 2021 | 2022 | 2023 | Totals |
| Charter Communications, Inc. 401(k) Savings Plan | $7,317,000 | $7,513,000 | $8,570,000 | $7,486,000 | $8,231,000 | $39,117,000 |
| Charter Communications, Inc. Retirement Accumulation Plan | $674,000 | $698,000 | $851,000 | $859,000 | $773,000 | $3,855,000 |
| Total | $7,993,019 | $8,213,020 | $9,423,021 | $8,347,022 | $9,006,023 | $42,982,105 |

40. During 2019, a minimum of $16,300,000 in Forfeited Plan Assets was available to Defendants to use to pay Plan Expenses.[3]

---

[3] The amounts in this paragraph and the subsequent paragraphs are based on the best information currently available, including but not limited to information derived from the Plan's Form 5500s and the Master Trust. In connection with discovery and after an accounting, Plaintiffs expect they will be able to calculate damages with precision.

41.     During 2019, instead of using the Forfeited Plan Assets to reduce plan expenses as required by the express terms of the Plan Document, Defendants caused Plan Participants to pay $7,317,000 in Plan Expenses through deductions from the accounts of Plan Participants and also caused Plan Participants to pay other Plan Expenses paid indirectly.

42.     During 2019, Defendants, contrary to the express terms of the Plan Document, exercised discretion over, and control of, plan assets when deciding to use $16,300,000 in Forfeited Plan Assets to, among other things, offset Charter contributions instead of paying all Plan Expenses with the Forfeited Plan Assets.

43.     Moreover, on December 31, 2019, unallocated Forfeited Plan Assets were $15,600,000.

44.     During 2019, Defendants exercised discretion over, and control of, Plan assets by failing to use unallocated Forfeited Plan Assets of $15,600,000 in a timely fashion for the exclusive benefit of Plan Participants to avoid having unallocated Forfeited Plan Assets of $15,600,000 on December 31, 2019.

45.     During 2020, a minimum of $29,900,000 in Forfeited Plan Assets was available to the Defendants to use to pay Plan Expenses.

46.     During 2020, instead of using the Forfeited Plan Assets to reduce Plan Expenses as required by the express terms of the Plan, Defendants caused Plan Participants to pay $7,513,000 in Plan Expenses through deductions from the accounts of Plan Participants and also caused Plan Participants to pay other Plan Expenses indirectly.

47.     During 2020, Defendants, contrary to the express terms of the Plan, exercised discretion over, and control of, Plan assets when deciding to use $29,900,000 in Forfeited Plan

Assets to, among other things, offset Charter contributions instead of paying all Plan Expenses with the Forfeited Plan Assets.

48.     Moreover, on December 31, 2020, unallocated Forfeited Plan Assets were $10,600,000.

49.     During 2020, the Defendants exercised discretion over, and control of, Plan assets by failing to use unallocated Forfeited Plan Assets of $10,600,000 in a timely fashion for the exclusive benefit of Plan Participants to avoid having unallocated Forfeited Plan Assets of $10,600,000 on December 31, 2020.

50.     During 2021, a minimum of $31,800,000 in Forfeited Plan Assets was available to the Plan Fiduciaries to use to pay Plan Expenses.

51.     During 2021, instead of using the Forfeited Plan Assets to reduce plan expenses as required by the express terms of the Plan, Defendants caused Plan Participants to pay $8,570,000 in Plan Expenses through deductions from the accounts of Plan Participants and also caused Plan Participants to pay other Plan Expenses indirectly.

52.     During 2021, the Defendants, contrary to the express terms of the Plan, exercised discretion over, and control of, plan assets when deciding to use $31,800,000 in Forfeited Plan Assets to, among other things, offset Charter contributions instead of paying all Plan Expenses with the Forfeited Plan Assets.

53.     Moreover, on December 31, 2021, unallocated Forfeited Plan Assets were $23,500,000.

54.     During 2021, Defendants exercised discretion over, and control of, Plan assets by failing to use unallocated Forfeited Plan Assets of $23,500,000 in a timely fashion for the exclusive

benefit of Plan Participants to avoid having unallocated Forfeited Plan Assets of $23,500,000 on December 31, 2021.

55.     During 2022, a minimum of $44,400,000 in Forfeited Plan Assets was available to the Defendants to use to pay Plan Expenses.

56.     During 2022, instead of using the Forfeited Plan Assets to reduce Plan Expenses as required by the express terms of the Plan, Defendants caused Plan Participants to pay $7,486,000 in Plan Expenses through deductions from the accounts of Plan Participants and also caused Plan Participants to pay other Plan Expenses indirectly.

57.     During 2022, Defendants, contrary to the express terms of the Plan, exercised discretion over, and control of, Plan assets when deciding to use $44,400,000 in Forfeited Plan Assets to, among other things, offset Charter contributions instead of paying all Plan Expenses with the Forfeited Plan Assets.

58.     Moreover, on December 31, 2022, unallocated Forfeited Plan Assets were $1,200,000.

59.     During 2022, Defendants exercised discretion over, and control of, Plan assets by failing to use unallocated Forfeited Plan Assets of $1,200,000 in a timely fashion for the exclusive benefit of Plan Participants to avoid having unallocated Forfeited Plan Assets of $1,200,000 on December 31, 2022.

60.     During 2023, a minimum of $35,300,000 in Forfeited Plan Assets was available to Defendants to use to pay Plan Expenses.

61.     During 2023, instead of using the Forfeited Plan Assets to reduce Plan Expenses as required by the express terms of the Plan, Defendants caused Plan Participants to pay $8,231,000

in Plan Expenses through deductions from the accounts of Plan Participants and also caused Plan Participants to pay other Plan Expenses indirectly.

62.    During 2023 Defendants, contrary to the express terms of the Plan, exercised discretion over, and control of, Plan assets when deciding to use $35,300,000 in Forfeited Plan Assets to, among other things, offset Company contributions instead of paying all Plan Expenses with the Forfeited Plan Assets.

63.    Moreover, on December 31, 2023, unallocated Forfeited Plan Assets were $1,500,000.

64.    During 2023, the Defendants exercised discretion over, and control of, Plan assets by failing to use unallocated Forfeited Plan Assets of $1,500,000 in a timely fashion for the exclusive benefit of Plan Participants to avoid having unallocated Forfeited Plan Assets of $1,500,000 on December 31, 2023.

65.    Under the terms of the Plan and the provisions of ERISA, throughout the Class Period, Defendants, acting as fiduciaries under ERISA and the Plan, improperly, disloyally, and imprudently exercised discretion over, and control of, Plan assets when directing the use of Forfeited Plan Assets.

66.    As described in detail above, throughout the Class Period, the Defendants, acting as fiduciaries under ERISA and the Plan, improperly, disloyally, and imprudently exercised discretion when deciding to use Forfeited Plan Assets to reduce employer contributions.

67.    Additionally, their improper, disloyal, and imprudent exercise of discretion served the best interest of Company because that option decreased Company's own contribution costs.

68.    Similarly, as described in detail above, throughout the Class Period, Defendants' decisions to use and use of Forfeited Plan Assets to reduce employer contributions instead of

paying Plan Expenses reduced the value of Plan Assets and the accounts of Plan Participants and the benefits available to Plan Participants.

69.     As described in detail above, throughout the Class Period, Defendants exercised discretion over, and control of, Plan assets when directing the use of Participants' accounts to pay Plan Expenses to service providers.

70.     There are no facts or circumstances throughout the Class Period that make the Defendants' decisions to use Forfeited Plan Assets to reduce Charter's contributions consistent with discharging their duties with respect to the Plan *solely* in the interest of the participants and beneficiaries **and for the exclusive purpose of providing benefits to participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan.

71.     As described above, throughout the Class Period, Defendants improperly, disloyally and imprudently exercised discretion over, and control of, Plan assets and consistently and reflexively chose to use the Forfeited Plan Assets to serve Charter's interest at the expense and to the detriment of the Plan and Plan Participants, by allocating Forfeited Plan Assets toward reducing Charter's contribution obligation to the Plan.

72.     All else being equal, had the Defendants decided throughout the Class Period to use Forfeited Plan Assets to defray Plan Expenses or allocated the Forfeited Plan Assets back to eligible Participants, the value of the Plan and the value of the accounts of the Plan Participants would have been greater thereby providing greater retirement benefits to Plan Participants.

73.     As noted above, just days after Charter received Plaintiff Jimenez' pre-suit request for documents pursuant to 29 U.S.C. §§ 1021, 1024 & 1132, Defendants, on information and belief, recognized that they had been caught violating the unambiguous, mandatory provisions of Sections 6.9 and 11.3 of the Plan by failing to use forfeited plan assets first to pay

all Plan administrative expenses *before* using any forfeited plan assets to defray Charter's obligation under the Plan to make Employer Contributions, and in the expectation they would be sued, hastily enacted an Amendment (with a first sentence that reads: "The Plan is hereby amended effective January 1, 2025") to Sections 6.9 and 11.3 of the Plan and removing the unambiguous, mandatory provisions of Sections 6.9 and 11.3 to remove the prior mandatory requirement to use forfeited plan assets first to pay all Plan administrative expenses *before* using any forfeited plan assets to defray Charter's obligation under the Plan to make Employer Contributions.

74.     The purported 2025 Amendments to those sections are as follows:

6.9 **Forfeitures**. If forfeited Accounts are reinstated pursuant to Sections 6.10 or 6.11, any such reinstated amounts shall be provided first from forfeitures available during the Plan Year and, to the extent forfeitures for such Plan Year are not sufficient, from Employer Contributions for such Plan Year. Assets in Accounts which are forfeited and not reinstated during the Plan Year pursuant to Section 6.10 or 6.11 shall be used to reduce the Employer Contributions for the immediately following Plan Year. Forfeitures used to offset Employer Contributions shall be allocated to each Controlled Group contributing to the Plan for a Plan Year based on the Employer Contributions made for the immediately prior Plan Year by the Employers in each Controlled Group, based on a ratio, the numerator of which is a Controlled Group's total Employer Contributions for the immediately prior Plan Year and the denominator of which is the total Employer Contributions for the immediately prior Plan Year for all Employers who are contributing to the Plan for the Plan Year. If forfeitures exceed Employer Contributions, any excess forfeitures shall be used to pay any expenses of administration not allocated to a Participant's Account as described in Section 11.3. Forfeitures will be used no later than 12 months following the close of the Plan Year in which the forfeitures were incurred under the Plan terms.

11.3 **Expenses of Administration**. Expenses attributable to the acquisition of investments in a Participant's Account and a proportionate share of the Plan's recordkeeping fees, which may be assessed on either a pro rata or per capita basis, as determined by the Administrator, as well as expenses assessed in connection with certain transactions, which may include, but shall not be limited to, withdrawals, distributions, qualification of domestic relations orders, and Participant loans, shall be assessed to the applicable Participant's account. All other reasonable and necessary expenses that may arise in connection with the administration of the Plan and Trust, including Trustee and brokerage fees, and other expenses associated with fund investments, legal fees, agents' fees, costs of supplies, auditing fees, and other costs of operation, shall be paid by the Trustee from forfeitures, to the extent that any forfeitures remain as provided in Section 6.9, and if none,

borne by Charter, which shall upon request reimburse the Trustee from time to time therefor.

75.    Those 2025 Amendments reflect that almost immediately upon review of and in response to the pre-suit request for documents, Defendants knew and believed that they had breached their duties and violated the express, mandatory provisions of the Plan, and that the definition of "Plan administrative expenses" for the Plan prior to 2025 was a broad one that encompassed the  broadest array of fees, including any that appear in the 2025 Amendment that were not expressly contained  in the Plan from 2017 through the end of 2024.

76.    Indeed, the term "Plan administrative expenses" is commonly understand, including by Charter and Defendants,  as a broad one.

77.    For example, the Plan's Form 5500 filing for 2023 at Part II Expenses under section (I) lists the following under "Administrative expenses:"

     I.    Administrative expenses:

         (1) Salaries and allowances

         (2) Contract administrator fees

         (3) Recordkeeping fees

         (4) IQPA audit fees

         (5) Investment advisory and investment management fees

         (6) Bank or trust company trustee/custodial fees

         (7) Actuarial fees

         (8) Legal fees

         (9) Valuation/appraisal fees

         (10)    Other trustee fees and expenses

         (11)    Other expenses

(12)    Total administrative expenses. Add lines 2i(1) through (11)[4]

78.    The 2025 Amendment, at most, can only apply on a going-forward basis beginning with calendar year 2005 and any attempt to retroactively apply any portion of the 2025 Amendment prior to 2025 (including with respect to forfeitures that accrued in 2024) is not only *void ab initio* but also would also represent an independent breach of duty.

## VI.    <u>CLASS ALLEGATIONS</u>

79.    Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

80.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as the representatives of, the following class (the "Class"):

All participants in and beneficiaries to the Charter Communications, Inc. 401(K) Savings Plan from the earlier of February 12, 2019 or the date the statute of limitations was tolled, through the date of judgment (the "Class Period").

81.    Excluded from the Class are Defendants and any Plan fiduciaries. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

82.    This action meets the requirements of Rule 23 of the Federal Rules of Civil Procedure and is certifiable as a class action for the following reasons:

---

[4] While the Form 500 cannot limit or alter the definition of "Plan administrative expenses," it does reflect the broad common understanding of the term.

83. **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time because such information is in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that many thousands of persons comprise the Class. Per Form 5500 filed with the DOL for the Plan year ending December 31, 2023, the Class includes at least 128,016 individual current Plan participants.

84. **Existence and Predominance of Common Questions of Law and Fact**: Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all Plan Participants and Beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

    a. Who are the fiduciaries of the Plan and whether the fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

    b. Whether Defendants breached fiduciary duties in violation of ERISA and the Plan;

    c. Whether Defendants breached their duty to follow the terms of the Plan;

    d. Whether Defendants engaged in prohibited transactions with Plan assets;

    e. Whether Defendants violated ERISA's anti-inurement provision by using Plan assets for their own benefit;

    f. Whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' various breaches of fiduciary duties and Plan

documents, and if so, the amount of damages or monetary relief that should be provided to the Plan and its participants;

g.   What Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches; and

h.   Whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches.

85.    Defendants have engaged in a common course of conduct as to Plaintiffs and the Class, involving similar or identical injuries and violations, and common questions far outweigh any potential individual questions.

86.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were, and are, Plan participants during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants alleged herein. Plaintiffs, all Class members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of their fiduciary duties to the Plan.

87.    **Adequacy**: Plaintiffs are adequate representatives for the Class because Plaintiffs' interests do not conflict with the interests of the Class that they seek to represent; Plaintiffs were Plan Participants during the Class Period and continue to participate in the Plan; and Plaintiffs are committed to vigorously representing the Class. Plaintiffs have retained counsel who are competent and highly experienced in complex class action litigation – including ERISA and other complex financial class actions – and counsel intend to prosecute this action vigorously. Indeed, undersigned counsel Messrs. Schwartz and Kriner from Chimicles Schwartz Kriner & Donaldson-Smith LLP have a proven track record in ERISA fiduciary breach litigation, including successfully

representing famous performers in *Edward Asner v. SAG-AFTRA Health Fund*, No. 20-10914-CAS (C.D. Cal.) and prominent musicians in *Snitzer v. Board of Trustees of the American Federation of Musicians Pension Plan*, No. 1:17-cv-5361 (S.D.N.Y.); and winning reversals of dismissals of 403(b)/401(K) breach of fiduciary duty claims in *Mator v. Wesco Distribution, Inc.*, 104 F.4th 172 (3d. Cir. 2024) (argued by Mr. Schwartz) and *Davis v. Wash. Univ.*, 960 F.3d 478, 483 (8th Cir. 2020) (where Mr. Schwartz served as plaintiffs' co-lead counsel). The interests of the Class will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

88.    **Superiority**: A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, inter alia, the records (including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

89.     Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

**COUNT I**
**BREACH OF FIDUCIARY DUTY TO DISCHARGE IN ACCORDANCE WITH PLAN**
**DOCUMENTS CONSISTENT WITH ERISA**
**(29 U.S.C. 1104(a)(1)(D))**

90.     Plaintiffs incorporate the above allegations as if fully set forth herein.

91.     As alleged herein, 29 U.S.C. 1104(a)(1)(D) imposes a fiduciary duty to act in accordance with the Plan documents and instruments governing the Plan.

92.     The Plan documents required the Defendants to use the Forfeited Assets in Accounts to pay expenses of administration of the Plan.  Defendants failed to discharge their duty to act in accordance with the Plan document by using Forfeited Plan Assets to reduce employer contribution obligations in violation of the explicit Plan terms.

93.     As a direct and proximate result of Defendants' fiduciary breaches, the Plan and the Class suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

94.     Plaintiffs have suffered losses as a direct result of the Defendants' breach of their fiduciary duty to discharge in accordance with Plan documents consistent with ERISA.

**COUNT II**
**BREACH OF THE DUTY OF LOYALTY**
**(29 U.S.C. § 1104(a)(1)(A))**

95.     Plaintiffs incorporate the above allegations as if fully set forth herein.

25

96.     Defendants, as affiliates and/or employees of Charter, had an omnipresent conflict of personal interest in decisions to serve the interests of the Participants and Beneficiaries versus the interests of Charter in decisions and actions to implement decisions regarding Forfeited Plan Assets. In exercising discretion and control over Forfeited Plan Assets and using them to reduce Charter contributions, Defendants served the interest of Charter and themselves at the expense of the interests of the Participants and Beneficiaries, in violation of ERISA and the Plan.

97.     As a direct and proximate result of Defendants' fiduciary breaches alleged herein, the Plan and the Class suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

98.     Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

99.     Plaintiffs have suffered losses as a direct result of the Defendants' breach of their duty of loyalty.

### COUNT III
### BREACH OF THE DUTY OF PRUDENCE
### (29 U.S.C. 1104(a)(1)(B))

100.    Plaintiffs incorporate the above allegations as if fully set forth herein.

101.    In exercising control over Forfeited Plan Assets and using them to reduce Charter contributions instead of Plan expenses in violation of the Plan, Defendants failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims *solely* in the interest of the Plan Participants and beneficiaries **and for the exclusive purpose of providing benefits to Plan Participants** and their beneficiaries **and defraying reasonable expenses** of administering the plan, in violation of ERISA and the Plan.

102.    By using Forfeited Plan Assets to reduce Charter funding obligations to the Plan instead of eliminating Plan Expenses, Defendants imprudently caused the value of the Plan's assets to decrease by causing Plan Participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses.

103.    Had the Defendants conformed with the standard of care required under ERISA, the Defendants would not have used Forfeited Plan Assets to reduce Company contributions.

104.    Had the Defendants conformed with the minimum standard of care required under ERISA, they would have used Forfeited Plan Assets to defray reasonable expenses of administering the Plan.

105.    Plaintiffs and the Class have suffered losses as a direct result of the Defendants' breach of their duty of prudence.

### COUNT IV
### ANTI-INUREMENT PROVISION
### (29 U.S.C § 1103(c)(1))

106.    Plaintiffs incorporate the above allegations as if fully set forth herein.

107.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

108.    Defendants violated 29 U.S.C. § 1103(c)(1) by funding Charter's contribution obligation with millions of dollars of Plan assets.

109.    The Defendants conduct caused the assets of the Plan to inure to the benefit of the employer in violation of 29 U.S.C. 1103(c)(1).

**COUNT V**
**PROHIBITED TRANSACTIONS**
**(29 U.S.C. 1106(a)(1))**

110.    Plaintiffs reallege and incorporate the above allegations as if fully set forth herein.

111.    29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . exchange . . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

112.    By using Forfeited Plan Assets to reduce Charter's funding obligation, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for employer contributions and obligations to the Plan and/or a use of Plan assets by or for the benefit of a party in interest.

113.    As a result of these prohibited transactions, Defendants caused the Plan to suffer losses in the amount of the Plan assets that were substituted for future employer contributions and the lost investment returns on those assets.

108. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited transactions alleged in this claim, to reverse and/or correct the prohibited transactions, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

## COUNT VI
## SELF DEALING/PROHIBITED TRANSACTIONS
### (29 U.S.C. 1106(b)(1-3)

109. Plaintiffs incorporate the above allegations as if fully set forth herein.

110. 29 U.S.C. § 1106(b)(1) prohibits a Plan fiduciary from acting in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the Plan or the interests of its participants or beneficiaries.

111. Defendants violated this prohibition in their management and control of Forfeited Plan Assets by using Forfeited Plan Assets to fund Charter's outstanding and unpaid matching contributions obligation, thereby conveying millions of dollars of Plan assets to Charter in service of Charter's interest and their own interests and for their own account.

112. They also violated 29 U.S.C. § 1106(b)(2) by acting in a transaction involving the Plan on behalf of a party (Charter) whose interests were adverse to the interests of the Plan, its participants and beneficiaries.

113. They also violated 29 U.S.C. § 1106(b)(3) by receiving consideration for their own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan.

114. This prohibited conduct saved Charter millions of dollars annually in employer matching contributions at the expenses of Plan participants.

115.    As a result of this prohibited conduct, Defendants caused the Plan to suffer losses in the amount of the Plan assets that were substituted for employer matching contributions and the lost investment returns on those assets.

116.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

## JURY TRIAL DEMANDED

117.    Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury on all issues so triable in this action and, alternatively, an advisory jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

a)  find and declare that Defendants have breached their fiduciary duties and engaged in prohibited conduct and transactions as described above;

b)  Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each violation of ERISA described above, and to otherwise restore the Plan to the position it would have occupied but for these violations;

c)  Order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above;

d)  Order the restoration of assets secured by Defendants as a result of each violation of ERISA described above into the Plan and the participant's individual accounts;

e) Determine the method by which Plan losses under 29 U.S.C. §1109 should be calculated;

f) Order Defendants to provide all accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a), including bringing forward calculations of losses on the conduct of Defendants from January 1, 2024 through to the date of Judgment;

g) Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

h) Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

i) Certify the class, appoint Plaintiffs as class representatives, and appoint Chimicles Schwartz Kriner and Donaldson-Smith LLP as class counsel;

j) Award to Plaintiffs and the class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

k) Order the payment of interest to the extent it is allowed by law; and

l) Grant other equitable or remedial relief as the Court deems appropriate.


DATED: February 12, 2025                    Respectfully submitted,

                                            */s/ James J. Rosemergy*_____
                                            James J. Rosemergy
                                            jrosemergy@careydanis.com
                                            **CAREY, DANIS & LOWE**
                                            8235 Forsyth, Suite 1100
                                            St. Louis, MO 63105
                                            Telephone: (314) 725-7700
                                            jrosemergy@careydanis.com

Steven A. Schwartz (*pro hac vice forthcoming*)

**CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP**
361 Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 645-4720
steve@chimicles.com


Robert J. Kriner, Jr. (*pro hac vice forthcoming*)
**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
2711 Centerville Road - Suite 201
Wilmington, DE 19808
Telephone: 302-656-2500
rjk@chimicles.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing Complaint has been served

by certified mail, as required by 502(b) of the Employee Retirement Income Security Act of 1974,

29 U.S.C. § 1132(h), on this 12th day of February 2025 on the following:

Secretary of Labor
U.S. DEPARTMENT OF LABOR
200 Constitution Ave NW
Washington, DC 20210
ATTN:  Assistant Solicitor
        for Plan Benefits Security

Secretary of the Treasury
15th and Pennsylvania Ave., N.W.
Washington, DC 20220
ATTN: Employee Plans
        Internal Revenue Service

*/s/ James J. Rosemergy*_____